ISHAM WEAVER, plaintiff in error, *vs.* DAVID OGLETREE, *et al.*, executors, defendants in error.

Where a son had in several instances used the name of his father, by signing it as surety to notes given by the son, and the father, with knowledge of the fact that such use had been made of his name, directed the holder of a note so signed, who applied to him to have it divided and two notes given, that part of it might be applied by the holder to a charitable use, to see the son about it, which he did, and the son agreed to have it arranged as desired, and in a day or two presented to the holder the two smaller notes, in place of the one, for the same sum, which were accepted by the holder, in the belief that the new notes had been signed by the father, as he made no objection to the genuineness of the note presented to him, in lieu of which the two were received, and the father afterwards, when sued on one of the notes, plead *non est factum*, and the jury found for the plaintiff: *Held*, that this Court will not control the discretion of the Court below in refusing to set aside the verdict and grant a new trial, as the facts made such a case as authorized the jury to presume and find that the son was the agent of the father to sign the note, or that the father ratified the act done by the son and made it his own.

*Non est factum.* Agency. Estoppel. Ratification. Before Judge GREEN. Newton Superior Court. September Term, 1869.

David Ogletree and others, as executors of Philemon Ogletree, sued John S. Weaver and Isham Weaver, upon a promissory note purporting to be signed by them, dated the 9th

December, 1861, and due the 7th of December, 1862, for $814 03, payable to the executors of said Philemon Ogletree. Isham Weaver plead *non est factum*. Plaintiff's counsel introduced a witness who professed to know Isham Weaver's handwriting, and who testified that he thought Isham Weaver signed said note. The note was read in evidence and plaintiff closed.

Isham Weaver testified that he never saw said note till he was sued on it, and did not sign it nor authorize any one else to sign his name thereto; that about the date of this note John Webb called on him and said he had a note on him and John S. Weaver for $1,200 00 or $1,500 00, and that he wished the note put into two notes, that he might turn over $500 00 of the amount to some religious society, and he told Webb to go and see John; the note was not shown to him, and he never heard more of it till plaintiff's attorney dunned him just before this suit, and he told said attorney to go to his son, John S. Weaver; he would have told the attorney that the note was not his deed, but he was ashamed; when Webb called on him, John S. had considerable property, and when the attorney dunned him, John S. had some property; when one of the plaintiffs called on him and proposed to take a small amount for the note, he told him that the note was not his, and that he would not pay it. It was then shown by several witnesses that Isham Weaver's name was not in his handwriting.

In rebuttal it was shown that from 1844, Isham Weaver and Philemon Ogletree had had transactions, and one of the executors testified that for ten years past Philemon Ogletree held a note on Isham Weaver, which in January, 1861, amounted to $1,225 00. Another of the plaintiffs testified, that to the best of his knowledge said note was repeatedly renewed in the lifetime of Philemon Ogletree, and that after his death the note and another were turned over to Webb to be renewed and divided for the purpose aforesaid. Webb returned this note as a renewed note after said $500 00 was taken out by said division; and when this witness called on Isham Weaver, recently, he admitted to witness that he had

known for years that his name was on said note; said that John S. had fraudulently used his name, and that he would not pay the note, adding that if this was the only one he might pay it, but as there were others he would let the Court decide the matter. John Webb testified that when he called on Isham Weaver for the purpose of having the note renewed and divided into two, he said "go and see John;" he saw John, and in a day or two John brought him this note and the other for the religious society, signed as was the old note. John S. was then good, and Isham made no impression on Webb that his name was not his genuine signature. It was shown that before Isham Weaver ever denied the genuineness of the signature, John S. had left the State.

The Court charged the jury that a party may bind himself to an unauthorized act of another, either by express or implied ratification. Express ratification is when a party adopts and confirms an unauthorized act of another, and assumes the liability thus created by a positive promise, and this relates back to the original transaction. Implied ratification arises when the party sought to be charged with an unauthorized act, is informed of it and does not repudiate it, but acquiesces in and does not dissent from it for any length of time.

The jury found for the plaintiffs for the principal and interest on the note and costs.

A new trial was moved for, upon the grounds that the verdict was unsupported by the evidence, and because said charge was hypothetical, and therefore calculated to mislead the jury. The new trial was refused, and that is assigned as error.

CLARK & PACE, for plaintiff in error.

A. B. SIMMS, J. J. FLOYD, for defendants.

BROWN, C. J.

The evidence submitted to the jury in this case showed that John S. Weaver had been using the name of his father, Isham Weaver, for years, on his own notes, and that this fact was known to Isham Weaver. But he took no steps to stop

this use of his name, and gave no notice to any one interested that it was not authorized by him. When, in the language of Isham Weaver, John Webb did call on him and John S. Weaver for some twelve or fifteen hundred dollars, and wanted the note divided into two, in order that he, Webb, might turn over some five hundred dollars to some religious society, he told Webb to go to John S. Weaver. He does not pretend that he even intimated to Webb that the note was not genuine, or that he was not bound to pay it. Webb went to John S. Weaver as he was directed, who told him all was right, to make the calculation, and he would have it arranged as he wished, and in a day or two he returned to him the two notes signed with the names of himself and his father, for an amount equal to the note he had presented to Isham Weaver; and Isham Weaver admits in his testimony that the note now sued on is dated about the time of the call on him by Webb, when he directed him to see John S. Weaver. When this note was presented to Isham Weaver for payment by Mr. Simms, the attorney, he swears that he would have told Simms that the note was not his act, but it involved his son, and he was ashamed.

We think the jury were authorized by the evidence to find that John S. Weaver had authority to sign the name of his father to the note, or if not, that the father, by his conduct, ratified the act of the son done without authority, and made it his own act and deed, and that he will not now be heard to deny its validity, when, by his conduct, he has induced others to act upon the belief that all was right. Mr. Chitty, in his treatise on Bills of Exchange, page 27, lays down the rule as follows: "A person may become drawer, indorser or acceptor, not only by his own *immediate* act, but also by that of his agent or partner. When a party insists that his name has been forged he may resist the payment at law or file a bill in equity. If he intend to resist the payment he should immediately, after hearing his handwriting has been imitated, give public notice, cautioning persons from taking bills or notes with his name thereon without first applying to him."

In Barber vs. Gingell, 3 Esp. N. P. C., page 60, it was

held as follows: " Action against the defendant as acceptor, who proved that the acceptance was forged by Taylor, the drawer, in answer to which it was proved that the defendant had been connected in business with Taylor, and that he had paid several bills drawn as the present, by Taylor, and to which Taylor (as it was supposed) had written the acceptance. And Lord Kenyon held, that this was an answer to the case of forgery set up by the defendant; for though he might not have accepted the bill, he had *adopted the acceptance* and thereby made himself liable to pay the bill." See Chitty on bills, page 31 note. Section 2166 of the Code declares that: " A ratification by the principal relates back to the Act ratified, and takes effect as if *originally authorized.* A ratification may be express or implied from the acts or *silence* of the principal."

As Isham Weaver was *silent* when the note was presented to him by Webb, and said nothing to notify Webb that the note he held and presented on him and John S. Weaver, was not genuine as to him, but referred him to John, who promptly agreed to divide the note and give the two smaller notes as desired, and soon after brought the notes, with the name of himself and his father upon them, we think this silence misled Webb and caused him to accept the new notes for the old one, and to give further time, when if the truth had been told, he, or those whom he represented, would most probably have taken steps to secure the amount while John S. Weaver had property. Under the state of facts made by this record and the authorities referred to, we are of the opinion that the Court below did not err in refusing to set aside this verdict, and grant a new trial.

Judgment affirmed.